Our next case and last for the day, well, actually for this panel, Arcelik v. Dupont, No. 22-2634. And you may proceed whenever you're ready. Good morning. May it please the Court. John Seaman on behalf of the appellant Arcelik. And with the Court's permission, I'd like to reserve two minutes for rebuttal. That's granted. How do we pronounce your client's name? Arcelik. Arcelik. Okay. Great. The trial court, Your Honors, erred in granting summary judgment to Dupont on Arcelik's negligent manufacturing and DCFA claims. The trial court's summary judgment ruling should be reversed and the case remanded for trial. But before getting into substance, I want to talk for just a second about the debate about the standard. Here, Dupont was the movement, Arcelik opposed. But to survive the defendant's motion, Arcelik needed only to present evidence from which a jury might return a verdict in its favor. And if so, if there's a genuine issue of fact, that would require a trial. That's from Anderson v. Liberty Lobby. Now, that's not to say that a mere scintilla of evidence would be enough to defeat a summary judgment motion. It's not. But as I'll explain, and I hope the record confirms, there is far more than just some evidence supporting Arcelik's claims. In fact, Arcelik presented what it believes is a mountain of evidence, not just a molehill. Well, let's talk about your agency theory, right? So at summary judgment, you conceded that you, quote, did not know, close quote, if Dupont China had the, quote, authority to alter the legal relations between the defendant and someone else, and that you didn't think there was any evidence that Dupont China had altered the legal relationships of Dupont. So if that's so, why isn't that enough to defeat the agency theory that your claim relies on? Okay. That line of questioning about altering legal relationships is a question that comes from the restatement in Judge Dyke's opinion. He cites two. You have to speak up. It's amazing. We're just 10 feet apart. It's hard to hear you. I'm sorry. You can hear me, right? I can hear you fine. Thank you. And if you can't hear me, please let me know. Sure. The altering the legal relationships of the entity point is one that Judge Dyke made in his opinion by citing to the restatement of agency. We think a better authority on which to look at for the agency element here is this Court's decision in Phoenix, Canada Oil, where this Court said that to focus on whether an agency relationship exists, the record must establish that an arrangement exists between the two corporations such that one acts on behalf of the other, and the arrangement must be relevant to the plaintiff's claim of wrongdoing. That should be the standard applied. The standard amounts. If we do that, then the question persists, right? Does DuPont China have the ability to alter legal relationships between DuPont and third parties? Yes, it does. Unless you tell me that that's not a factor that we should consider, right, I still need the answer to that. Because apparently you provided the answer, so either you disagree with the answer you gave or you disagree with it being a factor. I take it on both points. Yes, I disagree that it's the relevant factor, and I'll also distance myself from the answer previously given, because I think it is the case that DuPont China is absolutely in a position to alter the legal relationships of DuPont the parent. It does so by entering into contracts. We wouldn't be here if there wasn't a contract for the sale of Zytel to my client. So it alters legal relationships that way. Well, isn't it supposed to alter legal relationships between DuPont and third parties? Sure. DuPont's the seller, and ultimately my client's the indirect purchaser. So the sale of the product from initially DuPont China to DuPont India, from DuPont India to EPCOS India, from EPCOS India to Archelic in Turkey, those are all contracts that are affected by whether or not DuPont China can produce the product in an appropriate manner to the specifications with appropriate quality controls. So, yes, DuPont China does affect the relationships of DuPont the parent, but it also affects the tort relationships of the parent, just like a servant can affect the tort liability of its master. Here I don't think there's any difference in that if DuPont China is a negligent manufacturer, it's affecting the third party relationships of DuPont as it relates to the ultimate end purchaser here. The restatement factors, however, I'll reiterate, I don't think they're helpful factors for this court to consider. I do think that the Phoenix Canada oil standard is a more appropriate and helpful standard. There are other factors in the restatement that the district court referred to, such as that an agent is always a fiduciary of the principal. That's not really a helpful tool to us here to figure out if there's a fiduciary relationship. That doesn't help inform whether, in fact, the agent is acting on behalf of the principal in a way that would confer liability on the principal, and I think the same could be said about the altering the legal relationships point. Further on, it seems like perhaps one of the things you rely most on is the choice of Shandong Brother to produce this. Is that in itself enough to get you over the hump? It is because Phoenix Canada oil focuses on whether the arrangement is relevant to the plaintiff's claim of wrongdoing. Here, DuPont decided first whether to switch suppliers to Shandong Brother. Notably, it didn't inform its customers that it was switching to Shandong Brother. After it switched suppliers, it's supposed to qualify the new suppliers. It sets the global marketing and manufacturing standards. It sets the specifications for raw materials. It requires suppliers to provide certificates of analysis, showing compliance with all the specifications. And then it takes responsibility for dealing with customer complaints and deficiencies when products don't meet standards, and DuPont China had no role in any of those factors, including in the incident response. I wonder about that last point. They did do an investigation. It's true, but did they have to do an investigation? I mean, maybe they were just trying to be helpful, and, you know, I suppose that's another way to explain it, unless you have something else on the record. Yes, there were multiple investigations performed. There were many other customers. I mean, are we in a position where we're going to criticize the parent for trying to get to the bottom of it? Are we going to hold it against them? No, but I think it's an element that goes to control. So when we're focused under the Phoenix Canada oil standards, what's the arrangement between the two, and what's the level of control? That's what agency is about here. We're focused on control. And if the subsidiary is not in a position to remediate its problem, and if it's the parent that does the remediation, that shows where the control is, because the control over the relevant factors here that you pointed out, the selection of Shandong Brother and the quality controls and the like, are all factors and decisions made at the parent level. I think it's notable that it's really undisputed that DuPont China does not make day-to-day operational decisions about Zytel production. That was Mr. Mayo's deposition testimony. He's a 36 witness on behalf of DuPont. It's very clear that DuPont China does not make day-to-day operational decisions, doesn't make P&L decisions. If DuPont China is not making those decisions, then DuPont is making those decisions. And that's why our first point, and I don't want to overlook this, is that DuPont is, in fact, the direct manufacturer here. We make two arguments. One is the direct manufacturer, and also that DuPont China, if it's the agent, confers liability on the parent. And I want to make sure it's clear that contrary to the theory. Can I ask you a question? I thought it was interesting. You seem to disavow the alter ego. I mean, normally these types of cases with the argument that you're making is an alter ego argument, and yet you seem to want to back away from that. I'm not quite sure why. Alter ego is a high standard. We're not making an alter ego argument. Alter ego, for a Delaware lawyer to make an alter ego argument, there's got to be some really strange facts that would reflect that corporate formalities are not being met. This is not a case about corporate formalities not being met. This is about operation and control. All right, but, okay, I get your point, but it seems to me you're pushing something new, this direct manufacturing theory that's not an alter ego argument. What's out there that supports this new theory? We don't think it's a new theory. Well, first of all, we think we pled it clearly in the complaint. It appears six times explicitly that we've pled this theory. Well, partially in the context of other things. I mean, it's a little bit of cherry picking, I'm afraid. I think it's alternative. I think we pled it in the alternative. We pled, look, our first complaint did not focus on the agency argument, and it was dismissed with leave to replete, so we repled with an agency argument. We added agency allegations, and then there was no follow-up question to dismiss, so we survived that. But the support that I'd like to point the court to for this argument, and I don't think it's new, I'd like the court to consider the best foods case that our friends cite and also the district court cited. And while this is, in some ways, a products liability case, this appeal turns on traditional issues of corporate law regarding control and agency. And best foods stands for the general proposition that a parent is not liable for the acts of its subsidiaries. But best foods goes on to say that if the alleged wrong can be traced to the parent through its own management and the parent is directly a participant in the wrong complaint, then the parent is directly liable for its own actions. A parent can issue standards. A parent can approve suppliers and not meet that threshold that you're alluding to. You'd agree with that general proposition, though, right? Generally. I mean, just because a parent issues standards, right? I mean, what else is a parent going to do, right? These are my subsidiaries. Here are standards that we all want to live up to. You'd agree with that, right? That's the general proposition. Okay. So what is it specifically here? Because here there is a standard list of suppliers. These are suppliers you can use. These are standards we want you to adhere to. What makes it different here than in, let's say, the run-of-the-mill instance? Because here the specific wrongdoing relates to the selection and the qualification of the supplier. That's what this entire case is about. There are other manufacturing elements, we can see, that go on here. And the general oversight of a … So every time a parent lets its subsidiaries know these are a list of approved suppliers, that creates this kind of … This is much more specific than that. This is, we have a supplier, and we only have one supplier. We're boxed into this supplier, and it's gouging us right now. We need to switch to another supplier that can do it cheaper. We're not going to tell our customers that we're switching suppliers, and we switch to another supplier, and it can't meet the standards of quality that we set out for all of our suppliers, and this is something that's not conveyed to the customer. This is a very specific part of the theory. But I take Your Honor's point that on a general basis, yes, parents make statements across their subsidiaries. So you started your argument with talking about the summary judgment standards. And so when … So a lot of times, one of the ways that you beat summary judgment is you say there's a genuine dispute of material fact. There's another part that says entitled to judgment is a matter of law. And when I've heard your argument, it sounds to me like you're less focused on any genuine dispute of fact. You're saying these are the facts we all know. There's no question. Did you switch suppliers? Why did you switch? Those are all locked in. And so at one level, it seems that what you're really kind of asking for is for us to take the facts that are locked in and say that the district court erred as a matter of law as opposed to saying, oh, we got just competing factual theories, and we're going to have to send this to a jury to sort those out. Have I misconstrued your argument? Or are there actual disputes of fact where we say, oh, we don't know, this is up in the air? I see I'm out of time. Go ahead and answer. Both. We do submit that there are disputes of fact, and I think the district court record repeatedly said and our friends repeatedly say there is no evidence that. And our position is that, yes, there is evidence. There's a lot of evidence. That's not necessarily a dispute. That's more a Celotex thing. You can get summary judgment if the person with the burden, they have to make the showing. That's a Celotex angle. We've got the Anderson angle is what you're pushing, which is more that, oh, no, we have evidence. It's just in competition. But I don't – I didn't see – I see you responding to kind of the Celotex push, but I don't know that you've made the Anderson. And that's fine. You're just going to bank on matter of law. I think we are making both. And for us to fail here, we would have – there would have to be a complete failure of proof. This is not a record in which there is a complete failure of proof. There is proof. But so that you've defeated – assume that you come with a modicum of proof. You've beat Celotex. But that doesn't mean that your opponents aren't entitled to judgment as a matter of law. That just means that the facts are not in dispute. And so maybe we have a situation where all the facts are undisputed, and then we just have to make a legal determination in terms of is the degree of control, is the nature of the relationship such that this, as a matter of law, would support an agency relationship or it wouldn't. But that – the conversation right now, if I've listened and if I've traced it, is focused on legal issues, not factual issues. I do want to reiterate that we believe we are focused on both legal and factual issues, but I agree with your point that the legal issue here is what is the correct standard to apply. I don't think that the district court applied the correct standard. I think the district court was looking to the Japan petroleum standard that this court, in Judge Weiss's decision in Phoenix Canada Oil, distanced itself from. The Japan petroleum standard was a standard of actual participatory and total control, and Judge Weiss distanced himself from that when he said that when using the agency approach as opposed to the alter ego approach, the completeness of the subsidiary's domination by the parent is not material. So I – Is that a quote from Phoenix? That's a quote from Phoenix, yes. Where? 1478 of Phoenix. 1478? One second. Which side, please? This is Phoenix Canada, 1478. When using the agency approach, the completeness of the subsidiary's domination by a parent is not material. So, to your point, Judge Phipps, yes, we are making a legal argument. In addition to an argument under steel tax, there is not a complete failure of proof, and that the district court is improperly balancing evidence when it's weighing the evidence that we presented against our adversaries. But there's no – but you've come forth with no genuine dispute of fact. You just think that the district court misapplied the facts to what you believe the district court chose is the wrong legal standard. There are disputes as to whether there is day-to-day control over the entity. I think this is a critical point because the day-to-day control point comes from the line of alter ego cases. I think the district court opinion included that there must be day-to-day control. I think the factual evidence is that there is not day-to-day control, and the testimony from the 30B6 witness was, no, DuPont China does not exercise day-to-day control over its manufacturing operations. So I think that there is a dispute of fact over that, and that's a really significant point. Judge Green, we had a question. If we conclude that DuPont was not involved in the manufacturing, the defective CITEL, does your DCFA claim necessarily fail? Or may it continue independently? No, the DCFA claim is not dependent on whether there's an agency relationship or not between DuPont and DuPont China. The DCFA claim can be asserted against the parent or the sub in any event. There hasn't been an argument or a ruling. Well, I don't understand. If DuPont is not involved in the manufacturing, that would mean that your DCFA claim would have to be sustainable against DuPont China, right? The DCFA claim is an omission claim, so the omission is a DuPont omission. It's an omission of... So if it's not involved in the direct manufacturing, right, it's a hypothetical, right? I know it's not a hypo you like, but, right, DuPont on the direct manufacturing, we disagree. You lose, right? The DCFA claim, it's your position, could persist. Yes, it is. The DCFA claim goes to DuPont's statements in its product information sheets, its customer communications, that this is a Zytel FR-50 product, FR meaning flame retardant. And if it's an FR-50 product and you don't have testing in place to determine whether, in fact, the FR is flame retardant, and you can't determine whether or not the chemical composition of the flame retardant is as it's supposed to be, and you're not informing your customers of that, that is an omission by DuPont. There's no suggestion that DuPont China is making those omissions. These are all statements in materials where DuPont is the publisher of the materials. It's a DuPont... How are we supposed to think about this duty to speak? Because the way you've argued it makes it sound as though it's the application of a notion of strict liability, which is troubling. It's not that low. But the DCFA standard is more permissive than a fraud standard or negligent misrepresentation standard. The duty to speak here, I don't think it appears anywhere in the DCFA itself. How about Stevenson, though? Stevenson's our best case, and I think that is a good DCFA case. And the standard there is whether there is a statement of obvious material significance. In Stevenson, the issue was whether or not the sale of the home came with financing. But they also talked about duty disclosed, right? And it flows from there is a duty disclosed if the statement is of obvious material significance and it's not made. I think that's the conclusion from Stevenson. That's what we say has happened here. The lack of testing for flame retardant capabilities and ionic contamination in Zytel FR-50, no testing. That's an omission of obvious material significance. Should that have been disclosed? Yes. But if there's no agency relationship and there's no finding of – that's my hypothetical, right? There's no agency relationship and there's no direct manufacturing. How are you going to – how is this obligation created, this notion that this omission now creates liability? It's created through DuPont's communications to its customers in publications that you'll see in the record, which we call the product spec sheets or the product information sheets where it lists the characteristics of Zytel to its customers. All right. Thank you, counsel. We'll hear you on rebuttal. Thank you for your indulgences. Okay. Proceed, please. Thank you, Your Honor. And may it please the court, John Sensing of Potter Anderson and Caroon in Wilmington, Delaware, for the appellee E.I. DuPont, Dana Morrison Company. This court should affirm the district court's well-reasoned and correct opinion granting DuPont's summary judgment. And I'd like to begin with the bedrock principle that was referred to by my friends on the other side, that under Delaware law, a parent corporation is not liable for the acts of its subsidiaries. And the evidence on Archulech's negligent manufacturer claim is clear, that Archulech cannot clear the extremely high bar to pierce the legal separateness between DuPont and subsidiary DuPont China. DuPont does not exercise the control that is necessary for that finding over DuPont China's Zytel manufacturer. The district court was sitting in diversity, and it correctly followed Delaware law to hold that based on the undisputed facts, and to be clear, the facts in this case are undisputed, that Archulech has not and cannot adduce the necessary evidence to ignore the corporate separateness between DuPont and its subsidiary DuPont China, who is the actual manufacturer of the Zytel at issue. So, as you talked about with my friends from the other side, Archulech's negligent manufacturer claim is now premised on two alternative theories. One, that DuPont itself purportedly manufactured the Zytel at issue, and two, that DuPont China, the actual manufacturer of the Zytel, operated as DuPont's agent. Judge Dyke was correct to grant summary judgment on both theories. On direct manufacture— When you think about this case, one of the key arguments they make is, well, DuPont's in charge of the qualification and approval of suppliers, and that's, I think, a critical assertion that they make. Let's just start there. You say there are no disputes or genuine disputes. Is there a dispute on that? Well, I think there is a dispute as to how Archulech has framed the undisputed evidence, because Mr. Lawton of DuPont, his testimony was clear that with regard to a qualification of a supplier for DuPont China, DuPont China does the qualification work. DuPont China runs that qualification process. The tests that were performed in that qualification process, performed by DuPont China, anything Mr. Lawton learned about Shandong Brother, the supplier, was via DuPont China. But your adversary's key point was, I thought, on the change and then approval of a different supplier who supplied the ingredient that became then problematic in this defective Zytel. I mean, you were here. I'm pretty sure that was the point. Correct. And DuPont, I would say, rubber-stamped that. But the case law is clear that that is not a basis to hold DuPont liable. That wasn't his assertion. I beg your pardon. I thought his assertion was that DuPont flipped the supplier, and that the supplier had been A, and then DuPont required the supplier to be B. That's the assertion that was made. Is that not factually correct? Is that your point? Oh, no, that is factually accurate, that DuPont, there was a supplier, that it was a sole supplier. Any sole supplier situation, the sole supplier has a lot of leverage. And there is a decision that was made that there need to be additional suppliers. So the DuPont and its subsidiaries are not over a barrel with regard to the provision of flame retardant. Would you agree that DuPont flipped the supplier? Not DuPont China, but DuPont. I would agree that DuPont was – well, actually, I would not agree, because I think it was the Zytel business that made that decision, not DuPont. It's not somebody sitting in Wilmington, Delaware, on behalf of DuPont that says, we're doing this. But did they have any control over that decision? I mean, your answer to Judge Greenaway's question seems to say, no, DuPont did not initiate the decision to flip the supplier. Fine. But control isn't limited to just initiation, I don't think. And so my question is, did they have any role in that decision? I believe that Mr. Lawton, who is a DuPont employee, once DuPont China came to him and said, we've done the work, we've vetted Shandong Brother, at that point he basically checked the box. So what would have happened if he didn't check the box? I presume – I don't know, Your Honor, but I assume Shandong Brother would have either – excuse me, DuPont China would have either said, you know, why not, what other information do we need, or found another supplier. But I don't know. So checking the box is consequential. I would agree with that, but checking the box is not the day-to-day control that is necessary to hold DuPont liable. And the day-to-day control test is kind of an interesting one, because the question is almost a method of proof question. Day-to-day control may be one way of establishing an agency relationship, but is it the only way? Is it the exclusive way of establishing an agency relationship? I think that looking at the case law, I think that the cases say you do need to have that, that sort of actual participatory and total control. So no agency – no, I'm just – so at one level, there's just a – your position is that there's a really nice, clean, right-line rule for agency, which is absolutely amorphous. Every restatement rewrites it. Every court has a different gloss on it. But now, in this case, we have the opportunity to identify a clean rule, which is you must have day-to-day control over the – a principal must have day-to-day control over the agent. Otherwise, there's no agency relationship under Delaware law. Well, I don't think the court needs to go that far, Your Honor. I guess I respectfully – I would say that the court, on these undisputed facts, does not need to go that far. I think the court can just follow Phoenix, Canada. I think the court can follow Otto's Candies. The court can follow Company de Grand, Hotel d'Afrique. All three of those cases say that the control of the agent must be actual participatory and total. In those cases, Otto Candy and Company de Grand, Hotel d'Afrique, I think, are directly on point on this issue. And so just to tease out kind of what those components of that control – of that kind of control test mean, it does – I mean, at one level, it's actual. There's a box to check. It's participatory. DuPont has the opportunity to check the box. And then under the total component, it strikes me that if the box isn't checked, the supplier doesn't switch. So just what – so it has total control over at least this individual decision in terms of who the supplier is. And I think what you're saying to me is that aperture is too small. It has to be total control over something bigger than just the supplier decision. But if we isolate to just the supplier decision and the switch, maybe those boxes are met. And so the real question might be how big of a lens do we look at this? Well, and I think that's where you get to the point that the action – it has to have control over the specific wrongdoing which is alleged by the plaintiff. The wrongdoing here that was alleged is not DuPont switched to a new supplier – DuPont trying to switch to a new supplier and it should not have. It was we have Zytel that was produced and manufactured by DuPont China that was ionically contaminated. And the record is crystal clear, notwithstanding counsel's arguments a few moments ago, that DuPont has no role whatsoever in that process. And counsel admitted that on summary judgment. Judge Dyke asked, where is the evidence that DuPont controlled the day-to-day manufacture of Zytel in China? And counsel admitted – and this is pages 5785 and 5786 in the appendix – counsel admitted that DuPont does not control the manufacture of Zytel in China. And DuPont is not making those manufacturing decisions. Well, I think your adversary disputes that, but, you know, what that actually meant. But how do we then factor in DuPont springing into action once they find out there's a problem and taking over the investigation, I guess? Well, I think, again, the original investigation – I mean, you're sort of cabining it to check in a box. But once there's a problem, all of a sudden the parent springs into action. Well, I think the Zytel business sprang into action. I think Mr. Mayo's testimony is clear on that, that it's not E.I. DuPont, Dana Moores, and Wilmington, Delaware saying, oh, my gosh, we've got this issue, we need to spring into action. The investigation started in the Zytel – the Asian sector of the Zytel business. If the original investigation reports are all that, and then they say, this is serious, you know, we need to go higher up. So I would, I guess, respectfully push back a little on the idea that DuPont is parachuting in. Instead, you've got it coming up from below, to the extent DuPont's involved at all. Well, don't you want a parachuting in? Because if you argue that, you know, in response to Judge Phipps' question, is it a checking of the box or is there a more integral involvement, that is the impetus behind the problems, right? It's the imprimatur to the supplier, because the supplier is switched, it appears that DuPont's involved, and that supplier is the source of the potential problems. I understand there's a difference in argument about it, but that's their argument, that that's the source of the problem. Doesn't that sort of change the dynamic on thinking about the agency relationship? If DuPont is involved, the supplier, the supplier's the problem. DuPont, as has just been alluded to by my brother here, sort of drops in and kind of takes over the investigation. Doesn't all of that, when taken together, show that there is something to this agency relationship? I don't believe so, because for several reasons. Again, I think I come back to there's no allegation that the investigation was negligent. What was negligent here, the alleged wrongdoing, is the manufacture of this allegedly ionically contaminated Zyto. And the record is undisputed that DuPont had no involvement in that manufacture. So the fact that DuPont may have been involved in an investigation afterwards, you have a situation where that's not evidence that they're controlling the manufacturer itself. And I guess I would also, Your Honor made a point earlier, when my friends on the other side were speaking, I'd also raise the point that to find agency, the agent must have authority to bind the principal. Your Honor was exactly right to bring that up. And there's no evidence whatsoever that DuPont China was binding DuPont with regard to third parties. There's no evidence of any Zyto orders that were placed with DuPont that DuPont then had DuPont China handle. There's no contract saying that DuPont China is DuPont's agent. There's nothing in the record on that. And I would argue, Your Honor, that alone mandates affirmance. Let me just follow up on that point. You know, as I think of agency law, it tends to land in two different spaces. Are you a principal's agent for purposes of entering contracts? And then are you kind of an agent for torts that get committed? And when I think about this no authority to bind, doesn't that really kind of come out of the, I'm your agent for purposes of writing for entering contracts in business relationships strand of the case law? And doesn't, and don't we kind of relax that a little bit when it comes out in the torts context? There's all sorts of agency relationships where maybe a person acts on behalf of another, but isn't empowered to write contracts or to enter financial terms with someone else, but they may commit a tort along the way and we don't say, oh, you know, you didn't have the authority to enter a contract, therefore you can't be an agent. So what's interesting to me is that if that's true, if I've kind of maybe bifurcated the agency relationships into contract and tort, this is a tort case. And so the inability to bind the principal holds less sway, does it, not in a tort case than it would in a contract case? I don't necessarily think so, Your Honor. Certainly, I hear where Your Honor's coming from. I don't think that distinction, certainly that distinction has not been made in the briefing or argued by Archulet. I would just go back to what Judge Dyke said. I think he was exactly right with how he laid the standard out. But again, I'm not solely relying on the binding issue. We are also saying, look, there has to be control over the specific wrongdoing at issue. That's out of his candies. There was not there. And, Your Honors, I see I'm out of time. Judge Greenway's got a question. Yes. I asked your adversary about the connection between the direct manufacturing claim on the one hand and the DCFA claim and whether one was dependent on the other. That is, if the direct manufacturing claim goes away, may the DCFA claim survive? And I'd love to hear your view on that. I would say, theoretically, I understand there's some advocacy here. Not to be flippant. I mean, I guess I'd take the win however I could take it, Your Honor. And to be fair, that was not an argument that we made in the appellate briefing. But, you know, I see what Your Honor's getting at. If DuPont itself is not the manufacturer, you know, how can it be making omissions here? And I think it's correct that there is no evidence in the record of any omission. I think, you know, Judge Dyke was correct that there were no disclosures to Archulet regarding quality control processes, regarding supplier qualification processes. And without that sort of partial disclosure, which would implicate a duty to further speak, you don't have a DCFA claim here on omission. I'm out of time. Thank you, Your Honor. Thank you, counsel. We'll hear from your adversary in rebuttal. Thank you, Your Honors. I want to start first with the direct manufacturing point, because I think the district court understood that DuPont was in fact a direct manufacturer when on page 2, footnote 2 of the opinion, it stated, quote, Zytel is the trade name for a family of nylon resins that are manufactured and sold by defendant E.I. DuPont and the Morrison Company and certain of its subsidiaries. You think that's a substantive statement and not a perfunctory? I do think it's substantive because there's not a single marketing document or product specification document that identifies Zytel FR-50 as a DuPont China document, as a DuPont China product. DuPont China exists solely to produce DuPont products for sale to third parties. DuPont China, according to Mr. Mayo, does not act independently in relation to Zytel matters. That's a quote from Mr. Mayo in Appendix 3830. DuPont mandated that DuPont China produce a trademarked Zytel product consistent with its global quality manufacturing standards so that customers worldwide could be confident that they're buying a uniformly consistent DuPont product. And if a DuPont product failed to meet these global standards, DuPont's executives testified that it could not be used. Let me just pick up on a question that I was asking your friend on the other side, which is he says that there's no way that DuPont China could bind DuPont. Is that true? So the record supports? No, it's not true, and I don't think that is what the record supports. We're here. We're a consumer contractually. My client purchased a DuPont product that can only be sold by DuPont through the chain. My client's here as a result of a tort that – So are there any – I mean, I was conceiving of it as contract in torts. Maybe we can take the contract part off the table really fast. Does DuPont China have any ability to contract on behalf of DuPont, control to enter the contract, to set the terms, to do anything like that? Can it bind DuPont in any contractual way? DuPont China fulfills sales contracts that DuPont enters into. Okay. Does it bind DuPont China to any contractual terms? Judge Greenlee started off the entire oral argument with the question of what felt like a concession, which is can DuPont China alter the legal relationships of DuPont. We're almost coming full circle and ending with that. But I think that that was taken off the table, arguably, at the different court level. I'm just asking what's the evidence that DuPont China can bind DuPont? Now, that may not be fatal to you if you say that, oh, it's a different center of agency for torts. But I just want to know what the evidence is that DuPont China, and there is a contradiction in the positions that your client's taken in this from the district court till now, if you say that there is something. But what contracts can they enter or how can they otherwise bind DuPont? The only contract, to be candid, the only contract in evidence here is the sales contract between, I believe it's DuPont China and DuPont India. So the way that the product gets out of China and into the commerce stream is there's a factory in China, and in order to get it sold, it's sold through DuPont India. So to answer your question directly, I don't know that binding contracts helps us in the situation here to analyze the agency principle, which I think is more appropriately governed by Phoenix. So just to put a gloss on, I think, what you're saying, the answer that was given to the district court was an answer in the context of ability to alter legal relationships through contract, not necessarily to alter legal relationships through the commission of tort. Is that how you reprise that? I do, and that's why we're here. We're here on a tort claim, not a contract claim. So does that mean that the analysis because of Phoenix and agency has to, if you think of it in tort rather than contract, you're saying whether DuPont China can bind DuPont is irrelevant? As a matter of contract law, I do believe that's irrelevant. We're not focused on that factor. And I think that's what Phoenix Canada Oil speaks to. And I want to make it clear that the standard is not, as our friends articulated it, total, complete, and domination control. Phoenix Canada Oil distanced itself from that. And I want to make it. Thank you. Thank you. All right. I'm out of time. Thank you. I appreciate all your indulgences. Thank you. We'll take this case under advisement and thank counsel for their excellent arguments, both oral and written. And I'll ask the clerk to adjourn court, and we'd like to greet you.